**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LOCAL 591, TRANSPORT WORKERS UNION OF AMERICA, and individuals GARY PETERSON, BRIAN FRIEDMAN, WILLIAM CARPENTER, AND STEVEN LOSOS,<br><br>        Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>        Defendant. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL** |

## SUMMARY OF ACTION

1.      Plaintiffs, through their undersigned counsel, bring this action under the Railway Labor Act for declaratory, injunctive relief, and other appropriate relief to halt the interference of American Airlines, Inc. (AA) with the plaintiffs' efforts to represent their members with respect to critical issues related to aviation maintenance safety.

2.      In order to improperly keep airplanes in revenue service, Aviation Maintenance Technicians ("AMTs") at stations throughout the AA system have been subject to ongoing pressure from AA management representatives to commit maintenance fraud, disregard maintenance discrepancies, deviate from federally-mandated maintenance procedures, abstain from required lightning strike and bird strike

inspections, and otherwise violate federal aviation standards. AA management representatives have responded to the plaintiffs' efforts to represent their members regarding these matters with: 1) threats of discipline, including termination, 2) threats of arrest, 3) threats of station closure and/or reduction of staff, 4) unlawful surveillance of the plaintiffs' efforts, and 5) a refusal on the part of AA to make every reasonable effort to settle all disputes with respect to these issues.

3.      Defendant AA's actions constitute violations of the Railway Labor Act, 45 U.S.C. § 152, First, Third, Fourth, and Ninth. Because AA's actions constitute a fundamental blow to the plaintiffs' statutory rights and compromise public safety, the plaintiffs are entitled to declaratory and injunctive relief enjoining AA from continuing such actions.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction of this action (a) under 28 U.S.C. § 1331, because the case arises under the laws of the United States, the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188, (b) under 28 U.S.C. § 1337, because the matter in controversy arises under an Act of Congress regulating commerce, the RLA, and (c) under 28 U.S.C. §§ 2201 and 2202, because this is an actual controversy in which the plaintiffs seek declaratory judgment.

5.      Venue is properly laid in the United States District Court for the Northern District of Illinois as defendant AA resides and does business in the district as that term is defined by 28 U.S.C. § 1391(c) and because a substantial part of the events or omissions

giving rise to the claims arose in this district.

## THE PARTIES

6.     Plaintiff Local 591, Transport Workers Union of America ("Local 591") is a labor organization whose parent organization, the Transport Workers Union of America ("TWU"), has been certified by the National Mediation Board as the exclusive collective bargaining agent of the craft or class of Mechanics and Related Employees at AA.  The TWU delegates to Local 591 the authority to collectively represent approximately 3,500 Mechanics and Related Employees at all but one of the AA line maintenance stations, including, but not limited to: Chicago, Dallas, New York, Miami, Los Angeles and San Francisco.

7.     Plaintiff Peterson is the president of Local 591 and resides in Fort Worth, Texas.

8.     Plaintiff Brian Friedman is the Local 591 Central Region Vice President and resides in Rolling Meadows, Illinois.

9.     Plaintiff Steven Losos is a Local 591 ORD Station Chairperson and resides in Crestwood, Illinois.

10.     Plaintiff William Carpenter is a Local 591 ORD Title I Chairperson and resides in Walworth, Wisconsin.

11.     Defendant American Airlines, Inc. ("AA") is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business in Fort Worth, Texas.  AA operates as a "common carrier" by air and is

therefore subject to the provisions of the RLA, 45 U.S.C. §§ 151, *et seq*. AA conducts daily flights into and out of the airport located in O'Hare International Airport. AA operates line station and hangar maintenance operations in and around the O'Hare International Airport.

## FACTS

### AA's Recent History of Unlawful Maintenance Practices

12.     AA's recent history has been plagued by unlawful maintenance practices compromising passenger safety. In April 2008, the Federal Aviation Administration ("FAA") found AA to have engaged in faulty wiring practices that required the grounding of its entire MD-80 fleet. In July 2012, the FAA filed claims against AA in bankruptcy court seeking record fines for faulty maintenance practices, including (a) using Boeing 757 aircraft in revenue service without required wiring repairs, (b) failing to properly overhaul the main landing gear on approximately 30 Boeing 777 jets, (c) performing unauthorized engine repair work on Boeing 767 jets that were nonetheless released into revenue service.

13.     On May 31, 2013, United States Bankruptcy Court Judge Sean H. Lane approved an AA/FAA settlement reducing FAA proposed fines of $156,506,575.00 to $24,000,000 based, in part, on AA's commitment to comply with its In Accordance With (IAW) program and industry best practices. (**Attachment 1**, Exhibits B and C).

14.     The AA IAW program essentially replicates federal aviation regulations, which require that all persons performing aircraft maintenance must use the methods,

techniques, and practices prescribed in applicable manufacturer and airline maintenance manuals. 14 CFR §§ 43.13(a), 121.363(a)(2). The IAW program is centered on the mandate that aircraft maintenance technicians "will not perform maintenance without first looking up the procedure in current AMMs [Aircraft Maintenance Manuals], CMMs [Component Maintenance Manuals], ESO [Engineering Specification Order] or other authorizing documents." AA states that the benefit of strict adherence to written maintenance standards is that it reduces the AMT's "exposure to FAA Letters of Investigation and civil penalties, including fines, in the event your workmanship is ever questioned." (**Attachment** 1, Exhibit A at 1). AA's policy requires its AMTs to use IAW "all the time" and recognizes that, in view of this strict adherence, it would be "unrealistic" not to expect a decrease in production. (*Id*. at 2).

## AA's Violation of Terms of AA/FAA Settlement

15.     Notwithstanding the requirements of Federal Aviation Regulations ("FARs"), the AA/FAA settlement agreement, and the IAW program, AA-employed AMTs have been subject to increasing pressure to engage in unlawful and even fraudulent maintenance practices in order to keep AA aircraft in revenue service.

16.     In 2014, Local 591 received numerous reports from AMTs throughout the AA system that AA management representatives and their agents were subjecting them to threats and retaliatory treatment due to the AMTs' adherence to FARs and the IAW program. Chicago-based AMTs reported conflicts with management based on their determination to properly repair such items as cracked auxiliary power unit (APU) fuel

drain shrouds, radomes with substantial erosion damage, lightning strike damage, hydraulic leaks, and contaminated EWIS (electronic wiring interconnection system) wiring. AMTs reported that Field Engineering Authorizations (FEAs) were being improperly utilized to circumvent maintenance manual requirements. AA also suddenly removed all Inspectors from its Wide-body B-Check lines, a practice that had been in place since AA introduced Wide-body aircraft to its fleet, and insisted that AMTs perform what had been the Inspectors' work without any supplemental training in the completion of inspection work and with no incremental increase in AMT manpower to accommodate the additional workload. Shortly after the change, DFW AMTs complained that the performance of unfamiliar work would result in delays in evaluating and resolving maintenance discrepancies. In response, AA Regional Maintenance Director Edward Sangricco made statements to DFW AMTs that the AMTs should not worry about missing maintenance discrepancies due to the absence of Inspectors since the FAA would not punish them for such omissions. Subsequently, when the delays in evaluating and resolving maintenance discrepancies occurred, AA had the 777 B-Check, which had been performed at DFW since the airline took delivery of the 777, transferred to MIA.

17. In a stark reversal of required practice, AA Regional Maintenance Director Evita Rodriguez also advised AMTs that they should not initiate aircraft lightning strike inspections based on their detection of lightning strike damage in the course of their assigned work. Instead, Rodriguez and other management representatives directed that,

in the absence of a pilot report, AMTs should only initiate a lightning strike inspection if they actually saw the aircraft struck by lightning. Since AA policy at ORD requires the suspension of maintenance operations when there is lightning within five miles of the airport geographic center, Director Rodriguez's new policy would effectively eliminate AMT-initiated lightning strike inspections.

18.     In addition to increasingly frequent disputes with management representatives over the application of proper maintenance procedures, the AMTs were subject to explicit efforts to induce and/or coerce them into violating FAR and IAW standards. On September 5, 2014, AA Regional Maintenance Director Evita Rodriguez stated to AMTs that she could put every AA aircraft out of service based on maintenance issues and that the AMTs had to strike a "balance" between FAR compliance and "performance" because "I need my airplanes to go out in the morning." As an indication of the practices she wanted the AMTs to adopt, she explained that, when she was an AA AMT, it was "common practice" to sign documentation attesting to the sumping of Airbus fuel tanks without actually performing the work. In a separate encounter, Director Rodriguez warned plaintiff Friedman that if Chicago-based AMTs as a group reported maintenance discrepancies in excess of number that she considered acceptable, she would have to come up with plans to "deal" with them – a tacit threat of staff reductions and/or outsourcing. AMTs were also warned by an AA management representative that if the number of airplanes out of service did not decrease, AA Vice President of Line Maintenance Paul Wroble would dramatically reduce the maintenance staff as he had

previously done at Northwest Airlines.

19.     Several Chicago-based AMTs reported to the plaintiffs that they were subject to threats and discriminatory treatment based on their efforts to comply with the FARs and the IAW program.  A central element of the discriminatory treatment involved the placement of these AMTs on a "rogues list" both to stigmatize them and to curtail their ability to detect and report aircraft maintenance discrepancies.  Shift managers and other management representatives acknowledged that their implementation of discriminatory assignment practices, designed to steer certain AMTs away from aircraft maintenance, was for the purpose of punishing these AMTs and reducing maintenance write-ups.

**AA's Refusal to Make Every Reasonable Effort to Settle All Disputes Concerning FAR/IAW Violations**

20.     Local 591 representatives responded to the AMTs' complaints with a variety of measures.  AMTs were advised to file harassment complaints through the AA Human Resources ("HR") Hotline; however, AA HR representatives failed to respond to the complaints or steered the complainants back to the management representatives who were harassing them.  Local 591 Central Region Vice President Brian Friedman brought the discriminatory assignment practices to the attention of Station Manager Richard Cygan as a breach of the collective bargaining agreement; to which Station Manager Cygan responded:  "I don't care."

21.     AA has refused to make reasonable efforts to resolve disputes at the intermediate levels of the grievance process.  Due to the enormous backlog of grievances

between AA and Local 591, the insufficiency of arbitration hearing dates available to Local 591, and the limitations on arbitral remedial authority, any attempt to resolve the disputes through the CBA's grievance and arbitration process would be futile.

**AIR 21 Filing and AA's Continuing Refusal to Make Every Reasonable Effort to Resolve Disputes**

22. Chicago-based AMTs complained to Local 591 that the above-referenced responses to AA's discriminatory treatment were futile. Several advised that they were afraid to come to work, felt physically ill due to workplace stress, and felt increasing pressure to refrain from reporting maintenance discrepancies. Due to AA's refusal to make any reasonable effort to resolve these workplace issues, Local 591 discussed with Chicago-based AMTs the option of filing a whistleblower complaint with the United States Department of Labor pursuant to 49 USC § 42121. These actions are commonly referred to as AIR 21 complaints.

23. On October 6, 2014, six Chicago-based AA AMTs filed the AIR 21 complaint attached hereto as **Attachment 1**. On December 22, 2014, a Dallas-based AA AMT filed the AIR 21 complaint attached hereto as **Attachment 2.**

24. Notwithstanding the necessity of filing a formal AIR 21 complaint with the Department of Labor, Local 591 continued in its efforts to engage in a dialogue with AA to address the underlying workplace issues. By letter dated October 7, 2014, Local 591 President Gary Peterson wrote to Senior Vice President of Technical Operations David Seymour, with copies to AA CEO Doug Parker, Vice President of Line Maintenance Paul Wroble, and AA Managing Director Employee Relations for the TWU workgroups James

Weel, to express his regret that the Chicago-based AMTs felt compelled to file an AIR 21 complaint. (**Attachment 3**). Plaintiff Peterson advised the management representatives that the AIR 21 filing became a "necessity" for the complainants because their efforts to resolve the matters with local management were "utterly frustrated and at times even mocked." Plaintiff Peterson further advised that, when the AMTs sought to bring issues of safety-related discrimination and retaliation to the attention of Human Resources representatives, they were "either ignored or sent back to the local managers who were the source of retaliation." Plaintiff Peterson requested a "dialogue" with AA to resolve the underlying issues and expressed his belief that an "agreeable" resolution could still be achieved. Plaintiff Peterson closed the October 7 letter to AA senior management representatives by expressing his hope that "management will come to see the benefit of working with labor to promote issues of mutual interest, such as the airworthiness of our aircraft."

25.     By email dated October 9, 2014, Seymour responded to Plaintiff Peterson's October 7 letter stating that he would not discuss the AIR 21 complainants' claims with Local 591 because the complainants were represented by an attorney. (**Attachment 4).** At the time of this filing, AA has made no effort to contact the complainants' AIR 21 legal counsel. Moreover, AA's discriminatory treatment of the complainants has continued.

**FAA Investigation in Chicago and AA Threats to Discipline Local 591 Representatives**

26.     The United States Department of Labor transmitted a copy of the October 6, 2014, AIR 21 complaint to the FAA, which initiated its own investigation of the complainants' allegations.   After obtaining statements and documentary evidence supporting the complainants' allegations, the FAA broadened its investigation and has assigned at least four FAA investigators to the matter.

27.     The FAA investigation included visits to AA's Chicago station with the intent of interviewing AMTs other than the AIR 21 complainants.  Chicago-based AMTs were apprehensive about participating in FAA interviews due to concerns about the possibility of AA retaliation and AA's representations that individual AMTs, rather than AA, were the target of the FAA's investigation.  In one instance, Director Rodriguez stated to a Local 591 representative, in the presence of Station Manager Cygan, that no harm would come to her and Cygan as a result of the FAA investigation; rather, it would be non-management AMTs who would be subject to FAA enforcement actions.  By way of confirmation that only the AMTs, and not AA, would be subject to FAA action, Compliance Manager Lars Romme told AMTs at ORD that 18 Dallas-based AMTs had been subject to FAA Letters of Investigation.  Romme also told DFW AMTs that they were "shooting themselves in the foot by filing claims with the FAA" and that the AMTs at ORD should realize that nothing is going to happen to AA Management, the "guys are just screwing themselves."  Similar communications -- to the effect that the FAA investigation would only target individual AMTs in response to complaints based on

failures to comply with FAR/IAW standards -- were also made by other management representatives to Chicago-based AMTs.

28. Precisely because of AA's representations regarding the hostility of the FAA to the AMTs, as aggravated by the failure of verifiable action by local FAA representatives to act upon President Peterson's previous written request for an investigation into the changes in maintenance practices at DFW, the Dallas AIR 21 filing specifically requested that any FAA investigation of the complainants' allegations "be assigned to FAA personnel who do not regularly interact with AA personnel." (**Attachment 2**, ¶¶ 1, 17-21 and Exhibits G through K attached thereto).

29. Due to their concerns of retaliation by AA, and AA's representation of FAA hostility, AMTs requested union representation from Local 591 during FAA-conducted interviews and the FAA advised that it had no objection to the presence of union representatives provided that there was no interference with the FAA Investigators' line of questioning. On December 8, 2014, AA Manager Brian Ray advised Local 591 representatives, including plaintiffs Losos and Carpenter, that, if they attempted to provide representation for AMTs during the scheduled FAA interviews, they would be subject to discipline, up to and including termination.

30. The FAA Investigators continued AMT interviews off-property, ultimately interviewing over 20 AMTs, including AMTs who sought interviews at their own initiative to express their concerns about the pressure they experienced to perform maintenance in a manner that violated the FARs. Both AA's intimidation tactics, and the

necessity of conducting FAA interviews off-property, reduced the number of AMTs available for the FAA investigatory process. Nevertheless, the AMTs who did participate provided evidence indicating that over 20 AA aircraft may have engaged in revenue service in an unairworthy condition, with several of these unairworthy aircraft presently engaged in such service.

**FAA Investigation in Dallas and AA Surveillance and Threats of Arrest**

31. Due to references made by Chicago-based AMTs to events in Dallas, the FAA investigators advised Local 591 that it intended to expand its investigation into Dallas and Miami.

32. Local 591's own investigation of disciplinary action taken against Dallas-based AMTs led to the determination that AMTs were being subjected to retaliatory action for reporting safety violations, including: an AA supervisor's fraudulent sign-off of maintenance work, the presence of expired oxygen cannisters and missing equipment on aircraft that had just been released from a C-Check performed by Chinese vendor HAECO, improper maintenance on a cabin door seal, cracked engine pylons, defective blocker doors, unfixed cove panel doors, and the simple painting over of damage and removal of silver aluminum identification decals with no corrective action taken on aircraft also recently released from HAECO C-Checks, all of which were flown in revenue service with flight crews and passengers onboard.

33.     On December 4, 2014, Plaintiff Peterson and Plaintiff Friedman visited AA's Dallas station to continue their investigation of maintenance practices and other workplace-related issues.     Upon their arrival at the D Terminal Aircraft Maintenance break room, they were engaged by local AA Manager Otis Deboard, who monitored the two plaintiffs' activities.     Soon thereafter, Manager Deboard announced that he was leaving, and AA Supervisor Badih Delati advised Peterson that he would be following them wherever they went and asked where they were headed.     Peterson responded "A-section" and Delati responded he was directed to go "anywhere you are."     After their arrival at the A Terminal mechanics break room, plaintiff Peterson contacted Station Manager William Roper to complain that this high-level of surveillance prevented him from communicating with his members.     After declining to rescind the surveillance, Station Manager Roper threatened to have the union representatives arrested if they failed to conform with management directives.

34.     As with the FAA investigation in Chicago, Local 591 was forced to abandon its on-premises representation of its members with respect to safety-related maintenance issues at DFW.     On December 5, 2014, Local 591 resumed its investigation offsite in the presence of legal counsel.     On December 22, 2014, a Dallas-based AIR 21 complaint was filed due to the complainant's concern that he was a target for termination due to his adherence to FAA/IAW standards.     **(Attachment 2).**

35.     Local 591 representatives have received complaints of the violation of FAA/IAW standards, and of retaliatory actions taken against AMTs based on their

adherence to these standards, from AMTs at other stations in the AA system. Local 591 advised the FAA investigators of these reports; however, upon information and belief, the FAA team does not have sufficient resources to expand its investigation beyond the Chicago and Dallas stations. On January 8, 2015, Local 591 submitted a petition to the House Aviation Subcommittee requesting that the FAA Investigators be provided with sufficient manpower and necessary funding to complete their investigation but, to date, has received no response. **(Attachment 5).**

36.     Local 591's ability to represent its members and take effective remedial action with respect to safety issues at these other stations is compromised by the unlawful conduct complained of in this action, including: AA management's ongoing refusal to make every reasonable effort to settle safety-related disputes, its surveillance of Local 591 representatives, and its threats to discipline and/or arrest Local 591 representatives. Particularly in view of the FAA's limited resources, the public interest in aviation safety is being compromised by AA's unlawful conduct.

37.     AA's conduct has been (1) motivated by anti-union animus and constitutes an attempt to interfere with its employees' choice of their collective bargaining representative, (2) constitutes discrimination or coercion against that representative, and (3) involves acts of intimidation which cannot be remedied by administrative means. AA's actions constitute a fundamental blow to union activity and the collective bargaining process itself.

**<u>Injunction Criteria</u>**

38.     Plaintiffs are likely to succeed on the merits of their actions because their allegations are well pled and supportable.

39.     Plaintiffs will suffer irreparable harm without an injunction because the status of the union and the collective and individual rights of their members are threatened with permanent harm.

40.     There is no adequate remedy at law because plaintiffs' injuries cannot be remedied with a damages award.

41.     The harm that the plaintiffs will suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendant because the relief requires defendant to refrain from violating federal labor law.

42.     An injunction is in the public interest because the public has an immediate and future need to fly safely over common carriers, including tens of thousands of flying customers of defendant, whose interests in aviation safety are aligned with plaintiffs herein.

43.     No prior application has been made to this or any other court for the relief requested herein.

## COUNT ONE: VIOLATION OF RLA, SECTION 2, FIRST

44.     The plaintiffs repeat and reallege paragraphs 1 through 43 of the Complaint as if fully set forth herein.

45.     The conduct of AA and its management officials violates the command of Section 2, First of the RLA, which provides that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof," 45 U.S.C. § 152, First, and the plaintiffs have been, and continue to be, harmed thereby.

## COUNT TWO: VIOLATION OF RLA, SECTION 2, THIRD

46.     The plaintiffs repeat and reallege paragraphs 1 through 45 of the Complaint as if fully set forth herein.

47.     The conduct of AA and its management officials violates the command of Section 2, Third of the RLA, which provides that "neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives," 45 U.S.C. § 152, Third, and the plaintiffs have been, and continue to be, harmed thereby.

## COUNT THREE: VIOLATION OF RLA, SECTION 2, FOURTH

48.     The plaintiffs repeat and reallege paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49.     The conduct of AA and its management officials violates the command of Section 2, Fourth of the RLA, which provides that "it shall be unlawful for any carrier to interfere in any way with organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization...," 45 U.S.C. § 152, Fourth, and the plaintiffs have been, and continue to be, harmed thereby.

## COUNT FOUR: VIOLATION OF RLA, SECTION 2, NINTH

50.     The plaintiffs repeat and reallege paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     The conduct of AA and its management officials violates the command of Section 2, Ninth of the RLA, which provides that "the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter," 45 U.S.C. § 152, Ninth, and the plaintiffs have been, and continue to be, harmed thereby.

## PRAYER FOR RELIEF.

WHEREFORE, plaintiffs pray that this Court:

I.      Issue a Declaratory Judgment that the actions complained of herein are unlawful, and an injunction, the same to be made permanent on final judgment:

    A.      Restraining and enjoining AA, its officers, agents, employees and all persons acting on its behalf from engaging in any discipline, threats of discipline, staff reductions or threats thereof, or other forms of harassment designed to influence or interfere with its Mechanics and Related Employees' selection of a collective bargaining representative.

    B.      Restraining and enjoining AA, its officers, agents, employees and all persons acting on its behalf from disciplining, threatening with discipline, arresting, threatening with arrest, surveilling, or otherwise threatening or harassing Local 591 union representatives engaged in union representation activities.

    C.      Ordering AA, its officers, agents, employees and all persons acting on its behalf to treat with Local 591 and its representatives with respect to complaints of harassment and coercion complaints related to AMT adherence to FAA/IAW maintenance standards.

II.      Award punitive damages in favor of the plaintiffs and against the defendant.

III.      Grant such other, further, or different relief as may seem just and proper to this Court, including reasonable attorneys' fees and disbursements of this proceeding.

IV.      Order judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring the rights of the parties.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 22, 2015        Respectfully submitted,

*/s/ Christopher A. Kreid*

_____

Christopher A. Kreid
**CHRISTOPHER A. KREID
& ASSOCIATES, LLC**
1603 Orrington Avenue, Suite 1675
Evanston, Illinois 60201
Tel. (847) 869-0402
ckreid@caklaw.net

Lee Seham
Lucas Middlebrook
Stanley J. Silverstone
**SEHAM, SEHAM, MELTZ & PETERSEN, LLP**
445 Hamilton Avenue, Suite 1204
White Plains, NY 10601
Tel. (914) 997-1346
Lseham@ssmplaw.com
lmiddlebrook@ssmplaw.com
ssilverstone@ssmplaw.com

Nicholas Granath
**SEHAM, SEHAM, MELTZ & PETERSEN, LLP**
2915 Wayzata Blvd.
Minneapolis, MN 55405
Tel.: (612) 341-9080
ngranath@ssmplaw.com

*Attorneys for Plaintiffs*